## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | |
|---|---|---|
| **JOYCE AGBANOBI,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Case No. **3:25-cv-3379** _____ |
| | § | |
| **BERRY, APPLEMAN & LEIDEN LLP** | § | |
| **DBA BAL IMMIGRATION SERVICES,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Joyce Agbanobi ("**Joyce**" or "**Plaintiff**") files this Original Complaint against Defendant Berry, Appleman & Leiden LLP dba BAL Immigration Services ("**BAL**" or "**Defendant**"), concerning its acts, omissions, and status upon knowledge, and all other matters upon information, belief, and investigation, and respectfully shows the Court as follows:

### I. NATURE OF THE CASE

1.      As detailed below, BAL employed Joyce in a technological non-attorney role as a "Senior Manager – Product" until BAL wrongfully terminated Joyce's employment on or about March 18, 2025, for unlawful reasons, including her race, disability, and/or opposition to unlawful employment practices. This and other unlawful discriminatory, harassing, and/or retaliatory acts and practices to which BAL subjected Joyce violate Title VII of the Civil Rights Act of 1964, as amended ("**Title VII**"), the Americans with Disabilities Act, as amended ("**ADA**"), 42 U.S.C. §1981, as amended in 1991 ("**§ 1981**"), the Family and Medical Leave Act ("**FMLA**"), Texas Labor Code Chapter 21 ("**Chapter 21**"), and other applicable law. As a result, Joyce has been forced to bring this suit seeking a jury trial to recover back pay and front pay damages,

compensatory damages, punitive damages, statutory damages, attorneys' fees, interest, costs of court, and all other relief available at law or in equity, as set forth below.

## II.  THE PARTIES

2.    Joyce is an adult residing in Dallas, Texas, who at all times relevant to this lawsuit worked for BAL in Dallas, Texas.

3.    Defendant Berry, Appleman & Leiden LLP dba BAL Immigration Services is a California limited liability partnership with its principal place of business at 2400 N. Glenville Dr., Bldg. A, Richardson, TX 75082. BAL may be served with process through its registered agent, Jeremy Fudge, at its registered office, 2400 N. Glenville Dr., Bldg. A, Richardson, TX 75082. Issuance of citation to Defendant is requested.

## III.  JURISDICTION AND VENUE

4.    This Court has jurisdiction of this action under 28 U.S.C. § 1331 to the extent Plaintiff asserts claims under federal law, including Title VII, the ADA, §1981, and the FMLA.

5.    This Court also has jurisdiction under 28 U.S.C. § 1367 with respect to Plaintiff's claims under Chapter 21 since those state law causes of action are so related to the federal claims within the Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

6.    Venue is appropriate in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides within this District and § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

### IV. <u>STANDING AND PREREQUISITES</u>

7. At all times relevant to the claims giving rise to this suit Joyce was an "employee" of BAL and BAL was an "employer" as those terms are defined under Title VII, the ADA, 42 U.S.C.§ 1981, and Chapter 21 of the Texas Labor Code.

8. At all times relevant to the claims giving rise to this suit BAL employed more than 1,000 employees.

9. Joyce filed a Charge of Discrimination with the EEOC on or about September 2, 2025, less than 180 days from the date BAL terminated her employment.

10. Joyce received a Notice of Right-to-Sue Letter from the EEOC on or about September 16, 2025, less than 90 days before filing this Complaint.

11. All other conditions precedent to this suit have been performed or occurred.

### V. <u>BACKGROUND FACTS</u>

12. BAL hired Joyce as a "Senior Manager – Product" to work on technology products.

13. Joyce worked for BAL at its corporate headquarters at 2400 N. Glenville Dr., Bldg. A, Richardson, TX 75082.

14. BAL fired Joyce on or about March 18, 2025.

15. Joyce was highly qualified for her job, with 12 years of prior experience working at leading technology companies such as Microsoft, Amazon, and Jumia.

16. Joyce's expertise spans product management and technical program management, where she has successfully driven large-scale initiatives and contributed to impactful innovations.

17. Despite developing a disability while employed with BAL, Joyce always remained able to perform the essential functions of her job with or without accommodation.

18. Joyce is Black and a Nigerian immigrant.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **PAGE 3 OF 20**

19.     While she did not have any disability at the time she was hired, Joyce developed severe anxiety and depression during her employment with BAL as a direct and proximate result of the harassment, discrimination, and retaliation based on her race, color, national origin, and/or sex (and, eventually, disability) that she endured while employed with BAL.

20.     When she joined BAL as a Senior Manager – Product, Joyce was excited about the opportunity to contribute and grow.

21.     As an immigrant who had personally navigated the complexities of the U.S. immigration system, this role felt deeply personal.

22.     Indeed, BAL had once represented Joyce as her own immigration counsel when she worked at Amazon.

23.     The job at BAL presented a chance to combine her expertise in product management with her passion for helping others.

24.     From the start, however, she faced repeated instances of exclusion, dismissal, and hostility based upon her race, color, or national origin that significantly and negatively impacted her mental well-being and professional standing.

25.     One of the earliest instances occurred during a brainstorming session with leadership during which Joyce suggested a feature for the technology she was working on that would allow users to estimate the probability of their immigration case being approved.

26.     Before she could even finish, however, Joyce was cut off and her idea that she had not even been given the chance to fully present was summarily dismissed as "nothing new."

27.     The abrupt dismissal made clear that her input was neither valued nor welcomed.

28.     Joyce left the meeting feeling disrespected but continued diligently and successfully performing her job.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **PAGE 4 OF 20**

29.     Later, during a feature review session with Joyce's engineering lead, Ramesh, he shared his screen to walk the team through a functionality.

30.     While providing her feedback, Joyce noticed an open chat window where Ramesh had just sent a message to another engineer: *"Can Joyce shut up already?"*

31.     The entire team saw it.

32.     Someone pointed it out, and Ramesh quickly stopped screen-sharing, realizing his mistake.

33.     After the meeting, Ramesh apologized profusely and begged Joyce not to report him.

34.     When Joyce escalated the incident anyway to her manager, Diego Casillas, he initially dismissed her complaint summarily, without investigation, and defended Ramesh and the engineer.

35.     It was only when Joyce mentioned the apology that her manager acknowledged the issue, but instead of taking or even identifying any planned corrective action, he advised Joyce to keep it to herself and vaguely assured her, "I'll handle it."

36.     But no formal complaint was opened nor investigation conducted, and to Joyce's knowledge neither Ramesh nor the other engineer was ever disciplined.

37.     In other words, Joyce's manager blamed the victim until he no longer could, then swept the problem under the rug while telling the victim to keep quiet instead of exercising her lawfully protected right to report harassment and upholding his obligation as her manager to report it and take corrective action.

38.     Following these and other incidents, Joyce withdrew - she spoke less, contributed cautiously, and tried to avoid conflict.

39.    When Joyce brought this up with her manager, he encouraged her to be more vocal, telling her that her energy and confidence were what impressed BAL during interviews.

40.    Motivated by her manger's words, Joyce refocused on delivering great features and proving her value, and she delivered.

41.    Joyce's work spoke for itself, as she successfully launched one of the company's most impactful features, benefiting millions of immigrants and allowing BAL to court new clients.

42.    Joyce's contributions were recognized internally, and she was even nominated for a prestigious leadership training program in 2025.

43.    At a town hall, BAL's Chief Technology Officer publicly acknowledged Joyce's growing influence, stating that she had become one of the most well-known employees at the company.

44.    Given this momentum, Joyce sought a well-earned promotion.

45.    Shockingly, however, BAL not only denied the promotion, but worse harassed and retaliated against Joyce for seeking it.

46.    Specifically, shortly after the promotion request, Joyce was added to a meeting chat with an equity partner who provided feedback on a product feature.

47.    As the Senior Manager - Product, Joyce followed up with clarifying questions.

48.    Immediately after, her manager called her into his office and said words to the effect of, *"The equity partner is complaining about you. She said you asked too many questions and seemed like you didn't know or wanted to do your job. She also said she's worked with 'this developer' before, and you don't like doing your job."*

49.    Yet, Joyce was a Senior Manager – Product, not a developer, and she had never worked with this partner before.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                    **PAGE 6 OF 20**

50.    Joyce also had never voiced displeasure with her job, despite raising legally protected concerns about harassment and discrimination.

51.    When Joyce pointed this out to her manager and even searched her emails to confirm no prior interaction, her manager hesitated before responding with a harassing, discriminatory, and dismissive comment to the effect of: *"Well… maybe it's just how Americans use English differently."*

52.    This comment was obviously biased against Joyce's non-American national origin and was clearly based upon the non-native accent with which she speaks English.

53.    Despite this obvious unlawful harassment, Joyce attempted to keep the focus professional, asking if anything was wrong with her questions, since her manager had also been in the chat.

54.    Her manager admitted that nothing was inappropriate but still instructed her not to reach out to the equity partner for clarification.

55.    Soon after, Joyce began to suffer adverse employment consequences.

56.    For example, she was told there allegedly were no new projects for her team.

57.    Instead, she was assigned to work under an independent contractor Product Manager—a White male who was co-lateral as to position but, unlike Joyce, was not a full time employee of BAL.

58.    Joyce quickly realized that this was a deliberate move to strip her of job responsibilities and set her up to fail.

59.    For example, without limitation, meetings Joyce was previously invited to were now happening without her; she was excluded from key discussions, making it difficult if not impossible to contribute effectively; her manager ignored her concerns and

**PLAINTIFF'S ORIGINAL COMPLAINT**                                         **PAGE 7 OF 20**

consistently defended the contractor PM; and she was repeatedly cut off and dismissed in leadership meetings.

60. After one meeting, Joyce's manager accused her of being "rude" to a team member and said, "*Everyone is complaining about your behavior.*"

61. Joyce was shocked and confused, as she did not believe she had been rude or otherwise acted inappropriately.

62. Fortunately, the meeting had been recorded, and Joyce was able to review the recording.

63. Upon doing so proactively, Joyce was able to identify no evidence of any alleged rudeness or aggression.

64. When she confronted my manager, he hesitated before saying: "*Oh, well, the team just thought you were angry.*"

65. Thus, even in silence, Joyce was being perceived and labeled as the "angry Black woman," a well-known discriminatory racial slur.

66. When Joyce showed her manager the meeting transcript, disproving the allegations against her, he quietly apologized (after avoiding her for days) but took no further action.

67. Additionally, the White male contractor PM, Josiah, who had now taken over many of Joyce's responsibilities, repeatedly made inappropriate comments about her appearance in public meetings.

68. For example, without limitation, Josiah joked about Joyce's Nigerian clothing, such as laughing that she looked like she was wearing a "*coat of many colors*"; he repeatedly joked about Joyce's hair, leading constant choruses of laughter at Joyce's

expense; and he pejoratively suggested that Joyce, despite having an M.S. in Business Analytics, should become *a TikTok influencer* instead of a Product Manager.

69.     When Joyce reported these comments to her manager, he summarily brushed them off (as he had past complaints) and vaguely promised to take action that, to Joyce's knowledge, he never took (as with past complaints), as follows:

> I will bring this to his attention and make sure he doesn't joke around in this nature with and around you. I know CNG folks do this a lot (and I participate as well given that I'm good friends with Chris). I'll let him know either way so that he's aware of your concerns on such matters.

70.     Such harassing, discriminatory "jokes" should <u>*never*</u> be made in <u>*any*</u> workplace, but especially not in a <u>*law firm*</u> after the harassment has been reported to a supervisor.

71.     Likewise, a supervisor should <u>never</u> summarily disregard complaints about such misconduct, but especially not in a <u>*law firm*</u>.

72.     Unsurprisingly, since Mr. Casillas not only brushed off the reported misconduct *but also admitted to participating in it himself*, the harassing and discriminatory remarks continued despite Mr. Casillas's empty promises.

73.     The ongoing harassment and discrimination took a severe toll on Joyce, who began doubting herself and her abilities.

74.     Joyce's once confident personality disappeared, replaced by anxiety and self-doubt.

75.     She cried almost daily, feeling isolated and powerless.

76.    Eventually, the stress became too much to bear.

77.    Joyce took short-term disability leave to focus on her mental health, but the damage had already been done.

78.    Her condition worsened, forcing her into long-term disability and FMLA leave.

79.    Due to the severe toll the harassment and discrimination took on Joyce's mental and physical health, she had to return to Nigeria to get support from her family.

80.    Just two days after she landed, Joyce collapsed and was rushed to the hospital.

81.    She couldn't breathe and had to be placed on oxygen for three days.

82.    Her doctors were alarmed by her extremely high blood pressure and asked if she had been running from something in the U.S.

83.    She was also experiencing constant panic attacks. By this time, she had already been prescribed antidepressants, anti-anxiety medication, and blood pressure medication, and was placed under close medical supervision due to recurring thoughts of self-harm as a result of what she endured at BAL.

84.    Joyce's FMLA leave was scheduled to end on February 7, 2025.

85.    As the date approached, her blood pressure spiked again.

86.    She consulted her doctor, who strongly advised that she take more time before returning to work.

87.    Joyce informed the company of this update and noted that her doctor would release her soon.

88.     She also began the process of applying for long-term disability benefits to cover the remaining days beyond her short-term disability period.

89.     In the third week of February 2025, BAL's human resources department contacted Joyce stating that her role needed to be filled due to uncertainty around her return date.

90.     Joyce assured them that she would be returning within a few weeks, and they requested a doctor's note indicating her expected return date.

91.     After submitting the doctor's note, Joyce was told by HR that they had spoken with BAL's Chief Technology Officer and Joyce's manager, and that everyone was supposedly aligned and ready to welcome her back after this short-term, defined period of further disability leave.

92.     Despite her apprehension due to the unmitigated discrimination and harassment she had faced and her lack of any reason to believe the same would be any better upon her return, Joyce was still passionate about her job and wanted to return.

93.     She thus did so as had been agreed by BAL.

94.     Upon arriving at the office, however, she discovered that she still had no access to any BAL systems.

95.     When she reached out to her manager, he responded that he would contact IT and HR to reinstate her access.

96.     But that was just a cruel deception.

97.     Shortly after, on March 18, 2025, Joyce's manager and an HR representative called her into a meeting where she was informed that her role had already been filled.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                      **PAGE 11 OF 20**

98.    Joyce was presented with two equally unlawful and unsatisfactory options: accept a demotion, a help desk role, subject to a $108,000 pay cut from her then-current $168,000 salary; or accept a one-month severance and leave the company.

99.    Joyce's manager had already signed the severance agreement and attempted to pressure her to sign it immediately, but Joyce refused.

100.    Joyce was incredibly shocked and disheartened.

101.    Worse, though, she realized that the hiring process for her replacement must have begun while she was on protected disability leave.

102.    Joyce was aware that hiring someone for her role typically takes 6–12 weeks, and her date of return to work was only about a month past her FMLA-protected leave date and was consistent with the extended disability leave that BAL had approved.

103.    Yet, the new hire had begun working shortly before Joyce's return, meaning the recruitment process must have begun during Joyce's protected leave and thus showing BAL's intent to discriminate or retaliate against Joyce based on taking disability leave.

104.    Indeed, based upon the above and other evidence, it is clear that BAL simply never intended to keep Joyce's job for her, whether during her FMLA leave or during her reasonable accommodation period following it.

105.    For further example, during Joyce's disability leave, a colleague even reached out and shared that Joyce's manager was already interviewing someone and had mentioned Joyce would be moved to another team.

106.    While that had seemed odd at the time, Joyce then understood it was a reference to the help desk demotion Mr. Casillas apparently assumed Joyce would accept.

107.    Further, despite her significant contributions to BAL, Joyce was excluded from the discretionary bonus awarded in December 2024, while her peers received theirs.

108.    Joyce complained about this, and BAL attempted to avoid their obvious error by claiming that it was awarded in December but withheld *because Joyce was on FMLA leave*.

109.    This admission is shocking given that it is unlawful to withhold pay from an employee because they are on FMLA leave.

110.    While BAL ultimately paid the bonus after Joyce complained, BAL withholding it for roughly 4 months was still unlawful and still caused Joyce recoverable injury, including interest that was not paid by BAL on the late-paid bonus.

111.    Accordingly, as outlined above, Joyce was a victim of ongoing harassment and discrimination that led to her developing a disability for which she had to take leave from work, and she was then retaliated against for reporting the ongoing harassment and discrimination and/or for taking FMLA- and ADA-protected leaves of absence.

112.    BAL hired Joyce's replacement while she was on protected leave, and BAL then gave her the Hobson's choice of a $108K demotion, a month of severance, or involuntary termination.

113.    What began as an exciting opportunity for Joyce turned into an isolating, painful experience.

114.    Joyce went from being a high-performing leader—recognized and valued— to being sidelined, falsely accused, publicly diminished, and fired for unlawful reasons.

115.    This experience has had lasting effects on Joyce's career, confidence, and mental health.

116.    As a result of the above actions by BAL, Joyce has lost past and future wages and benefits of employment that she received from BAL.

117.    Further, as a result of the above actions by BAL, Joyce has suffered pecuniary losses and past and future compensatory damages, including but not limited to, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

118.    BAL's wrongful actions and omissions in discriminating, harassing, and retaliating against Joyce were committed knowingly, intentionally, with malice, and/or recklessly in violation of Joyce's state and federally protected rights.

119.    Joyce has attempted to attain substantially equivalent employment since BAL her.

120.    Joyce has been forced to retain legal counsel to bring her claims.

## VI. CAUSES OF ACTION

### A.    COUNT 1: VIOLATION OF TITLE VII

121.    Title VII prohibits discrimination, harassment, and retaliation on the basis of race, color, national origin, and sex, and prohibits retaliation for opposing such misconduct

122.    BAL discriminated, harassed, and/or retaliated against Joyce on the basis of race, color, national origin, and sex as described in Section V hereinabove, which is incorporated by reference as if fully restated herein.

123.    For example, without limitation, BAL allowed its employees to make inappropriate comments regarding Joyce's race, color, and national origin; failed to take corrective action to stop such misconduct, which persisted; treated Joyce worse than similarly situated male peers; and retaliated against Joyce for reporting such misconduct, including taking away job responsibilities and, ultimately, presenting her with the Hobson's choice of a demotion or involuntary termination.

124.    BAL had no legitimate, non-discriminatory, non-harassing, non-retaliatory reason for its acts and omissions.

125.    Any purported legitimate, non-discriminatory, non-harassing, non-retaliatory reason BAL may proffer for its acts and omissions is merely pretext for unlawful discrimination, harassment, or retaliation.

126.    Joyce is legally entitled to recover and seeks recovery under Title VII of her back pay, front pay, lost benefits, out-of-pocket costs, compensatory and punitive damages in the maximum amount allowed by law, injunctive relief to prohibit similar conduct in the future, attorney's fees, and all other relief, special and general, available at law or in equity.

**B.    COUNT 2: VIOLATION OF THE ADA**

127.    This Count 2 is plead in the alternative to the extent necessary.

128.    The ADA prohibits harassment, discrimination, or retaliation on the basis of disability and requires employers to afford reasonable disability accommodations.

129.    BAL harassed, discriminated, and/or retaliated against Joyce for taking disability leave as described above, including without limitation having no intent to protect her job, hiring her replacement while she was on disability leave, and refusing to reinstate her in her prior job upon returning from disability leave.

130.    BAL also failed to honor a reasonable accommodation request, namely, for a short-term, limited and defined duration disability leave after her FMLA leave ended, as BAL initially approved the extension of her disability leave but, upon her return to work, told her that her job had been given to someone else and she had to accept a demotion or involuntary termination.

131.    BAL had no legitimate, non-discriminatory reason for taking such actions.

132.    Any purported legitimate, non-discriminatory reason BAL may proffer for such actions is merely pretext for unlawful discrimination, harassment, or retaliation.

133.    Joyce is legally entitled to recover and seeks recovery under the ADA of her back pay, front pay, lost benefits, liquidated damages, injunctive relief to prohibit similar conduct in the future, attorney's fees, and all other relief, special and general, available at law or in equity.

## C.    COUNT 3: VIOLATION OF § 1981

134.    This Count 3 is plead in the alternative to the extent necessary.

135.    Section 1981 prohibits discrimination, harassment, and retaliation on the basis of race.

136.    BAL discriminated, harassed, and/or retaliated against Joyce on the basis of race, and subjected her to a racially hostile work environment, as described in Section V hereinabove, which is incorporated by reference as if fully restated herein.

137.    BAL fired Joyce because of her race and her opposition to racial discrimination, harassment, and/or retaliation.

138.    BAL had no legitimate, non-discriminatory, non-harassing, non-retaliatory reason for its acts and omissions.

139.    Any purported legitimate, non-discriminatory, non-harassing, non-retaliatory reason BAL may proffer for its acts and omissions is merely pretext for unlawful discrimination, harassment, or retaliation on the basis of race.

140.    Joyce is legally entitled to recover and seeks recovery under § 1981 of back pay, front pay, lost benefits, out-of-pocket costs, compensatory and punitive damages in an amount not capped by law, injunctive relief to prohibit similar conduct in the future, attorney's fees, and all other relief, special and general, available at law or in equity.

D.    **COUNT 4: VIOLATION OF FMLA**

141.    This Count 4 is plead in the alternative to the extent necessary.

142.    The FMLA contains two distinct protections. *Nero v. Indus. Molding Corp.,* 167 F.3d 921, 927 (5th Cir.1999) (citing *Bocalbos v. Nat'l W. Life Ins. Co.,* 162 F.3d 379, 383 (5th Cir.1998); *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 159–60 (1st Cir.1998); *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712–13 (7th Cir.1997)).

143.    The first establishes what the Fifth Circuit recognizes as a series of entitlements or substantive rights, including an employee's right to return to the same position after a qualified absence. *Nero,* 167 F.3d at 927 (citing *Bocalbos,* 162 F.3d at 383).

144.    "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Nero,* 167 F.3d at 927 (citing *Hodgens,* 144 F.3d at 159).

145.    The second protection prohibits employers from retaliating or discriminating against an employee for exercising their rights under the FMLA. *Nero,* 167 F.3d at 927; *see also* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave.").

146.    To prove a prima facie case for FMLA retaliation, the employee must show: (1) they are protected under the FMLA; (2) they sought to return to work before the FMLA leave expired; and (3) the employer failed to reinstate the employee to the position, or an equivalent position. 29 U.S.C. § 2614(a)(1) (2000).

147.    Here, Joyce was protected by FMLA as she had been employed more than 12 months, and BAL approved her FMLA leave and an extension of such leave.

148. Joyce sought to return to work before expiration of her FMLA leave, which BAL had agreed to extend.

149. BAL failed to reinstate Joyce to the same or an equivalent position.

150. Additionally, or in the alternative to the extent necessary, BAL retaliated and discriminated against Joyce for exercising her FMLA rights, including without limitation by hiring her replacement while she was on leave and offering her the Hobson's choice of a demotion or involuntary termination upon her return from her extended FMLA leave.

151. Joyce is legally entitled to recover and seeks recovery under the FMLA of back pay, front pay, lost benefits, out-of-pocket costs, compensatory and punitive damages, injunctive relief to prohibit similar conduct in the future, attorney's fees, and all other relief, special and general, available at law or in equity.

**E.      COUNT 4: VIOLATION OF TEXAS LABOR CODE CH. 21**

152. This Count 4 is plead in the alternative to the extent necessary.

153. Chapter 21 prohibits discrimination, harassment, and retaliation on the basis of race, color, national origin, sex, and disability, and prohibits retaliation for opposing such misconduct

154. BAL discriminated, harassed, and/or retaliated against Joyce on the basis of race, color, national origin, sex, and disability as described in Section V and Sections VI.A-D hereinabove, which are incorporated by reference as if fully restated herein.

155. For example, without limitation, BAL allowed its employees to make inappropriate comments regarding Joyce's race, color, and national origin; failed to take corrective action to stop such misconduct, which persisted; treated Joyce worse than similarly situated male peers; retaliated against Joyce for reporting such misconduct; and retaliated against Joyce for taking

FMLA and disability leave. This included taking away job responsibilities and, ultimately, presenting Joyce with the Hobson's choice of a demotion or involuntary termination.

156. BAL had no legitimate, non-discriminatory, non-harassing, non-retaliatory reason for its acts and omissions.

157. Any purported legitimate, non-discriminatory, non-harassing, non-retaliatory reason BAL may proffer for its acts and omissions is merely pretext for unlawful discrimination, harassment, or retaliation.

158. Joyce is legally entitled to recover and seeks recovery under Chapter 21 of her back pay, front pay, lost benefits, out-of-pocket costs, compensatory and punitive damages in the maximum amount allowed by law, injunctive relief to prohibit similar conduct in the future, attorney's fees, and all other relief, special and general, available at law or in equity.

## VII. <u>JURY DEMAND</u>

159. Plaintiff hereby demands a trial by jury in the above-captioned matter.

## VIII. <u>PRAYER</u>

For the foregoing reasons, Plaintiff prays for entry of judgment against Defendant awarding Plaintiff all relief and damages as stated above, including past and future lost compensation and benefits, past and future compensatory damages, punitive damages, liquidated damages, injunctive relief, reinstatement if reasonably possible, attorneys' fees, costs of court, and such other relief, both general and special, at law and in equity, to which Plaintiffs may be justly entitled.

Dated: December 9, 2025.                    Respectfully Submitted,

                                            */s/ Michael R. Steinmark*
                                            **MICHAEL R. STEINMARK**
                                            State Bar No. 24051384
                                            **STECKLER WAYNE & LOVE, PLLC**
                                            12720 Hillcrest Road, Suite 1045
                                            Dallas, TX 75230
                                            Telephone: 972-387-4040
                                            Facsimile: 972-387-4041
                                            *michael@stecklerlaw.com*

                                            **ATTORNEYS FOR PLAINTIFF**